## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| LeRon Howard, | ) | |
| | ) | |
| Petitioner, | ) | **ORDER DENYING PETITION FOR** |
| | ) | **WRIT OF HABEAS CORPUS** |
| vs. | ) | |
| | ) | Case No. 1:15-cv-082 |
| Colby Braun, Warden, NDSP, | ) | |
| | ) | |
| Respondent. | ) | |

Before the court is a Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a

Person in State Custody filed by petitioner, LeRon Howard ("Howard") and respondent's Motion

to Dismiss. Both parties consented to proceed before a magistrate judge.[1] For the reasons set forth

below, Howard's petition is denied and respondent's motion is granted.[2]

## I.    BACKGROUND

### A.    Trial

On May 2, 2011 a criminal Complaint was filed in the District Court for Stutsman County,

North Dakota, charging Howard and co-defendant Janelle Alexandra Cave ("Cave") with Murder,

a class AA felony and Criminal Conspiracy, a class AA felony. (Ex. 2). A criminal Information was

subsequently filed on July 7, 2011. (Ex. 3). On January 27, 2012, the State moved to sever the trials

of Howard and Cave. (Ex. 7). On January 30, 2012, the state trial court granted the State's motion

to sever the trials. (Ex. 8). On March 23, 2012, the state trial court ordered a multi-county jury panel

---

[1] Howard filed his consent form on July 1, 2015. (Doc. No. 6). The State filed its consent on September 2, 2015. (Doc No. 12).

[2] The relevant state-court records are filed at Doc. No. 10 and will be referred to herein by their respective exhibit numbers.

pursuant to N.D.C.C. § 27-09.1-05.1. (Ex. 11). The order required a panel of 80 jurors, including 60 from Stutsman County and 20 from Barnes County. (Ex. 11). Howard filed a motion for change of venue on April 9, 2012, and an amended motion for change of venue on April 13, 2012. (Exs. 12 and 13). The state trial court denied Howard's motion for change of venue on May 2, 2012. (Ex. 15).

On August 23, 2012, the jury found Howard guilty of Murder, a class AA felony and Criminal Conspiracy, a class AA felony. (Exs. 19 and 20). Howard moved for a new trial and/or dismissal of count two, Criminal Conspiracy, on August 31, 2012. (Ex. 21). On September 13, 2012, the state trial court denied Howard's motion for a new trial. (Ex. 23). On November 14, 2012, Howard was sentenced to life without parole. (Ex. 26).

**B.      Direct appeal**

Howard  appealed his conviction to the North Dakota Supreme Court on December 5, 2012. (Ex. 27). Howard argued that: (1) the trial court erred in using a multi-county jury panel; (2) the trial court erred in denying his motion for change of venue; and (3) there was insufficient evidence to sustain his convictions for murder and criminal conspiracy. Id. On October 22, 2013, the North Dakota Supreme Court rejected his claims and affirmed his convictions. State v. Howard, 2013 ND 184, 838 N.W.2d 416 ("Howard I").

**C.      State postconviction proceedings**

Howard next filed an application for postconviction relief with the state trial court on January 15, 2014. (Ex. 32).   Howard claimed: (1) the jury was unconstitutionally selected and impaneled because of the biases of several of the jurors; (2) counsel was ineffective in several respects; and (3) there was prosecutorial misconduct. Id. The State filed an answer to Howard's application for

postconviction relief and also moved for summary disposition. (Exs. 33 and 34). On February 24, 2014, Howard filed a second application for postconviction relief that included the same general claims alleged in the first application. (Ex. 35). The State submitted an answer and moved for summary dismissal of Howard's second application for postconviction relief. (Exs. 36 and 37). Howard was then appointed counsel, who filed a supplement to Howard's application for postconviction relief on April 24, 2014, that included additional discussion with respect to the points already raised and a new claim of insufficiency of the evidence. (Ex. 38). The State again moved for summary disposition. (Ex. 39). On June 10, 2014, the state postconviction court dismissed the application for postconviction relief without holding a hearing. (Ex. 40).

Howard appealed the order dismissing his postconviction application. (Ex. 41). On April 28, 2015, the North Dakota Supreme Court affirmed the state postconviction court's dismissal of the postconviction application. Howard v. State, 2015 ND 102, 863 N.W.2d 203 ("Howard II").

### D.    Federal habeas petition

Howard next filed his § 2254 petition with this court. (Doc. No. 2). Howard's petition raises four different grounds for relief. In his first ground, he alleges that there was insufficient evidence to allow a guilty verdict on the criminal conspiracy charge. In his second ground, he alleges that his trial counsel was ineffective for multiple reasons. In his third ground, he alleges that the state trial court erred in empaneling a multi-county jury panel and denying his amended motion for change of venue. In his fourth and final ground, he alleges prosecutorial misconduct. (Id.).

### E.    Evidence supporting Howard's conviction

The following factual summary, taken verbatim from the decision of the North Dakota Supreme Court on direct appeal, is set forth below because it provides context in evaluating

Howard's claims.

[¶ 2] In April 2011, the body of Abdi Ali Ahmed was discovered down a muddy embankment along the side of a rural gravel road in Stutsman County, near Jamestown. At trial, Sheriff's Deputy Falk testified, after examining the body at the crime scene, he noticed two apparent stab wounds, one in the victim's abdomen and the other in the victim's rib area. Deputy Falk testified there were also abrasions on the victim's chest and lacerations on the forearms and wrists. State Forensic Examiner Dr. William Massello, who conducted the autopsy, testified he determined Ahmed's cause of death was from a blunt head injury and a stab wound to the abdomen.

[¶ 3] On the night of April 29, 2011, Ahmed was seen socializing with Howard at a bar in Jamestown and later at a house party. In the early morning hours of April 30, Howard and Ahmed left the house party together along with Janelle Cave. Cave drove Howard and Ahmed to her trailer. Soon after arriving, Howard and Ahmed were involved in a physical altercation that took place outside the trailer. Cave and Howard's testimony concerning the fight conflicts substantially.

[¶ 4] Howard testified he observed Ahmed and Cave arguing and "it looked like [Ahmed] was fixing to make an attempt to put his hands on her ... so my first reaction was to hit him, and I hit him." At trial, Howard admitted he struck Ahmed twice in the head. Ahmed fell to the ground and Howard "kicked him a couple times" while Ahmed was down. Howard testified, "I kicked [Ahmed], and then it seemed like he kicked me back, so ... I grabbed him by his legs and I drug him from one side of the street to the other side of the street." After striking Ahmed in the head and dragging him across the pavement, Howard was uncertain whether Ahmed was conscious. He testified Ahmed was mumbling, and he could not understand what he said. Howard then testified he said the following to Ahmed, " 'I'm sorry. I'm going to fix this. I'm going to get you some weed,' ... and then it seemed like he had a lot of trouble getting up, so I helped him up." Howard put Ahmed in the backseat of Cave's car.

[¶ 5] Cave testified she did not have an argument with Ahmed. She testified Howard and Ahmed walked out of the trailer together while she was inside. Shortly thereafter, she went outside and discovered Ahmed laying on the ground "all the way across the street." Cave testified she checked Ahmed's pulse and felt his heartbeat. She tried to wake Ahmed up by nudging him. Cave was uncertain how long Ahmed had been unconscious. Cave testified Howard dragged Ahmed across the street and placed him on the floorboards in the backseat of her car.

[¶ 6] Howard and Cave both testified that Cave drove the three of them to Delmonty Jones's residence to smoke marijuana. It is unclear whether Ahmed was conscious during the drive to Jones's house. The State alleges that prior to leaving for Jones's residence, someone retrieved Cave's decorative sword from her trailer and placed it in the car. Cave testified she did not take the sword out of her house or see

4

Howard do likewise. Howard also testified he did not put the sword in the car or see Cave put the sword in the car.

[¶ 7] Howard and Cave both testified that, after reaching Jones's house, they left Ahmed in the car while they smoked marijuana inside the residence. Howard testified the following dialogue transpired: " 'Old boy [Ahmed] out in the car probably want to smoke,' but [Cave] was like, 'Oh, he's not—he ain't even responding. Like, he's not moving or anything.' " Cave testified Howard told Jones "there was a body in the car." Jones testified Howard brought a sword wrapped in a blanket into the house. Jones then testified Howard told him "I want to put—put a body in your well." Cave testified Howard and Jones joked about what to do with the body and Jones laughed and said, "just put him in the field." Howard and Cave left approximately ten to twenty minutes later and headed back toward Cave's trailer. Howard took the sword with him. Cave was driving. It is unclear whether Ahmed was conscious in the backseat.

[¶ 8] At some point the car was stopped, Ahmed was thrown out of the car, stabbed, and left in the gravel road. Howard and Cave each testified they were present when Ahmed was stabbed, but they each place the blame on the other party. Cave testified she pulled over and put her car in park because the dome light came on. She exited the vehicle because Howard got out and she went around the car and stood near the passenger side taillight. Cave testified Howard pulled Ahmed out of the backseat of the car. Cave testified she saw the tip of the knife and saw Howard kick and stab Ahmed. She testified it appeared Ahmed was kneeling when Howard stabbed him. Cave testified she and Howard got back in the car and she drove to the James River. Cave testified she threw the sword in the river. The sword was discovered on the riverbank in early 2012 by a fisherman.

[¶ 9] Howard's testimony conflicts substantially. Howard testified that, on the trip back to Cave's trailer, Cave hit the brakes and said, "I don't want [Ahmed] in the car." In response, Howard grabbed Ahmed from the backseat and threw him out of the car. Howard testified before he was all the way out of the car, "[Cave] was already coming around the car, and I didn't think anything of it, and I was like, 'You've got to get out,' and [Ahmed] was mumbling still. So I let him go, and then that's when she proceeded to just hit him with the knife out of nowhere...." Howard testified Cave swung the sword at Ahmed and then stabbed him twice. Howard testified he jumped back in the car out of shock, looked in the rearview mirror and last saw Ahmed standing in the middle of the road while he and Cave drove away. Howard testified Cave put the sword in a towel and put it on the side of the driver's door with her. He testified he did not see the sword again until trial.

Howard I, 2013 ND 184, ¶¶ 2-9.

## II.   GOVERNING LAW

### A.   Scope of Review

Under 28 U.S.C. § 2254, a federal court may review state-court criminal proceedings to determine whether a person is being held in custody in violation of the United States Constitution or other federal law.  However, where the state court has adjudicated the federal claim on the merits, this court's review is limited by 28 U.S.C. § 2254(d) to a determination of whether the state court's decision is (1) directly contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) based on an unreasonable determination of the facts based on the evidence presented in the state-court proceeding.  See 28 U.S.C. § 2254(d); see generally Harrington v. Richter, 562 U.S. 86, 97-100 (2011) ("Richter"); Williams v. Taylor, 529 U.S. 362, 399-413 (2000).

This highly deferential standard of review is often referred to as "AEDPA deference" because it was enacted by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). E.g., Pederson v. Fabian, 491 F.3d 816, 824-25 (8th Cir. 2007); see generally Renico v. Lett, 559 U.S. 766 & 773 & n.1 (2010).  The reasons for the limited review are ones of federalism and comity that arise as a consequence of the state courts having primary responsibility for ensuring compliance with federal law in state criminal proceedings.  See, e.g., Richter, 562 U.S. at 103.

### B.   The exhaustion requirements

The exhaustion doctrine codified at 28 U.S.C. § 2254(b)-(c) precludes granting habeas relief for claims that have not been properly exhausted in the state courts.  E.g., Rhines v. Weber, 544 U.S. 269, 274 (2005); Dixon v. Dormire, 263 F.3d 774, 777 (8th Cir. 2001).  Proper exhaustion has two components.  First, the claim must be "fairly presented," which requires that the petitioner present

both the factual and legal premises for the claim, with the latter being satisfied if there is a reference to the particular federal constitutional right or a citation to a state or federal case that raises the constitutional issue. Dansby v. Norris, 682 F.3d 711, 722-23 (8th Cir. 2012), vacated on other grounds, Dansby v. Hobbs, No. 12-8582, 2013 WL 506561 (U.S. June 3, 2013); Carney v. Fabian, 487 F.3d 1094, 1096 (8th Cir. 2007). Second, the petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addition, there are three other aspects of the exhaustion doctrine that are important. The first is that the exhaustion doctrine is satisfied if there are no state-court remedies available and exhaustion would be futile, such as when the claim has been procedurally defaulted at the state-court level. E.g., Armstrong v. Iowa, 418 F.3d 924, 926-27 (8th Cir. 2005). The second is that Rose v. Lundy, 455 U.S. 509 (1982), prohibits a petitioner from proceeding with a "mixed petition" of exhausted and unexhausted claims. See also Rhines v. Weber, 544 U.S. at 273-74. The third is that § 2254(b)(2) authorizes the court to deny a claim on the merits notwithstanding a failure to exhaust. E.g., Gringas v. Weber, 543 F.3d 1001, 1003 (8th Cir. 2008).

### C.    Procedural default

A federal district court is precluded from substantively considering a habeas claim that has been procedurally defaulted at the state level on independent and adequate state grounds. E.g., Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). State procedural grounds are independent and adequate if they are firmly established, readily ascertainable, and regularly followed. Barnett v. Roper, 541 F.3d 804, 808 (8th Cir. 2008); Franklin v. Luebbers, 494 F.3d 744, 750 (8th Cir. 2007).

They must also further a legitimate state interest and not be applied in an exorbitant manner. Barnett, 541 F.3d at 808.

The rule barring procedurally-defaulted claims is nearly absolute. Cagle v. Norris, 474 F.3d 1090, 1099 (8th Cir. 2007). The only exceptions are the rare instances when a prisoner is able to meet the strict cause and prejudice or actual innocence standards. E.g., Dretke v. Haley, 541 U.S. 386, 392-93 (2004); Arnold v. Dormire, 675 F.3d 1082, 1087 (8th Cir. 2012).

**D**. **State defenses of res judicata and misuse of process**

Under N.D.C.C. § 29-32.1-12, res judicata and misuse of process are affirmative defenses in state proceedings for postconviction relief. Res judicata is defined in subsection (1) to be a claim that was fully and finally determined in a prior proceeding. Misuse of process is defined in subsection (2)(a) to include any "claim for relief which the applicant inexcusably failed to raise either in a proceeding leading to a judgment of conviction and sentence or in a previous postconviction proceeding[.]" These procedural defenses are regularly enforced by the North Dakota courts. E.g., Tweed v. State, 2011 ND 228, ¶ 12, 807 N.W.2d 599; Steen v. State, 2007 ND 123, ¶ ¶ 13-17, 736 N.W.2d 457; Laib v. State, 2005 ND 187, ¶¶ 6-7, 705 N.W.2d 845.

## III. DISCUSSION

### A. Ground One: Sufficiency of the evidence

#### 1. Howard's claim of insufficiency of the evidence

Howard contends that there was insufficient evidence to sustain his conviction for criminal conspiracy because of the lack of evidence of an agreement between Howard and Cave to attack or

cause Ahmed harm, implicitly or explicitly.  (Doc. No. 2, p.5).[3]  Howard argues that the "only item that can be proved as a result of act [sic] after the road incident are those of facilitation by concealment of a non-planned crime, a less severe charge." Id.

### 2. State court proceedings

Howard first raised this claim in his motion for a new trial.  (Ex. 21).  The trial court rejected it, stating:

> During trial, the evidence was very clear and consistent up to the point that Cave, Howard, and the victim arrived at the trailer home in Western Park Village early in the morning of April 30th.  After that, the stories of Cave and Howard diverge.  Cave has given so many versions of the events, either under oath or under questioning by law enforcement, that she has little credibility on any of the pertinent points of contention.  At t rial [sic] s he [sic] either gave vague testimony or claimed to be absent or unable to recall when questioned about anything of substance.  Howard's testimony was generally credible and cleared up many loose ends left dangling after the close of the State's case.  Nevertheless, not all of his testimony was credible.
>
> His claim that he was unaware of the presence of the sword in the vehicle is not credible and is directly contradicted by the testimony of Delmonte Jones, who said Howard brought a sword into his home wrapped in a blanket.  While Jones has some credibility issues of his own, he obviously did see the sword in his house, or he would not have been able to report it and describe it to law enforcement personnel, who were unaware of its existence until he made his report.
>
> Howard admitted hitting the victim outside of the trailer home, admitted dragging him across the street and loading him into the car, and admitted he was along when they drove the obviously incapacitated victim more than 10 miles out of town to a relatively remote area.  He denied Cave's claim that he stabbed the victim.  There were, however, small amounts of blood on his clothes.
>
> He testified that it was Cave who had slashed and stabbed the victim, and claimed to be shocked by the events that unfolded along the gravel road.  He was adamant that there was never a plan to murder the victim, who he considered to be a friend.  Howard did admit he disposed [sic] the clothes he was wearing during the

---

[3] Howard claimed insufficient evidence in regard to both the murder and the criminal conspiracy convictions in his direct appeal.  However, in his § 2254 petition, Howard challenges only the sufficiency of the evidence in support of the conspiracy charge.

incident, and admitted concealing himself after the incident, both of which may indicate consciousness of guilt. He denied Cave's assertion that he ordered her to throw the sword in the river, claiming he was not even with her at the time, but admitted it was his idea to drive to Jones' home with the victim. Any number of his or Cave's acts may constitute an overt act in furtherance of a conspiracy.

The jury spent considerable time culling through the evidence and making their factual determinations. Precisely what happened along the gravel road may never be known, but there was substantial evidence of defendant's involvement in both a conspiracy to commit murder and a murder.

(Ex. 23, at 5-6).

Howard then included his claim of insufficient evidence with respect to the conspiracy charge in his direct appeal. (Ex. 28). The North Dakota Supreme Court denied the claim, stating only that "the criminal judgment [was] supported by substantial evidence." Howard I, 2013 ND 184, ¶ 23 (citing to N.D. R. App. 35.1(a)(3)).

### 3. Governing law

A conviction obtained without proof beyond a reasonable doubt is constitutionally invalid. See Evans v. Luebbers, 371 F.3d 438, 442 (8th Cir. 2004). When a habeas petitioner alleges insufficient evidence, the test is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In applying this standard, the scope of the habeas court's review is extremely limited in that it "must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and . . . must defer to that resolution." Sexton v. Kemna, 278 F.3d 808, 814 (8th Cir. 2002) (quoting Miller v. Leapley, 34 F.3d 582, 585 (8th Cir.1994)). In other words, the court is not permitted to conduct its own inquiry into witness credibility and make a *de novo* determination of guilt or innocence. See

<u>Robinson v. LaFleuer</u>, 225 F.3d 950, 954 (8th Cir. 2000) (opining that credibility determinations are a task reserved to the jury).

### 4. State court's denial of claim was not unreasonable

Pursuant to N.D.C.C. 12.1-06-04(1):

> A person commits conspiracy if he agrees with one or more persons to engage in or cause conduct which, in fact, constitutes an offense or offenses, and any one or more of such persons does an overt act to effect an objective of the conspiracy. The agreement need not be explicit but may be implicit in the fact of collaboration or existence of other circumstances.

Therefore, in order to convict a person of conspiracy to commit murder, the State must prove an agreement to commit murder plus an overt act performed by any person to the conspiracy. <u>State v. Keller</u>, 2005 ND 86, ¶51, 695 N.W.2d 703.

In considering the trial evidence, which was fairly outlined by both the district court and the North Dakota Supreme Court, a rational trier of fact could have found beyond a reasonable doubt that there was an implicit agreement between Howard and Cave to engage in or cause conduct that constituted murder. For example, even by the accounts of both Howard and Cave, the jury could have inferred from their keeping Ahmed in the car and not seeking medical attention for him that there was a tacit agreement he would be disposed of in some fashion. Following that, there were many overt acts in furtherance of the charged conspiracy committed by Howard and Cave either jointly or separately.

For these reasons, it cannot be said that the North Dakota Supreme Court's rejection of Howard's claim of insufficiency of the evidence with respect to the conspiracy charge was (1) either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or (2) based on an unreasonable determination of the facts.

Consequently, Howard's claim of insufficiency of the evidence with respect to the conspiracy charge fails.

**B.      Ground Two:  Ineffective assistance of counsel**

**1.      Governing law**

Under Strickland v. Washington, 466 U.S. 668 (1984), a defendant who claims ineffectiveness of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defendant.  In regard to this analysis the Court explained in Strickland that:

> [T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in [any particular] order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.  In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Id. at 697.

The test for deficient performance under the "first Strickland prong" is whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Id. at 688; Rompilla v. Beard, 545 U.S. 374, 380 (2005). When the issue involves a matter of trial strategy, there is a strong presumption that the strategy was sound and was not ineffective assistance. See Bell v. Cone, 535 U.S. 685, 698-702 (2002).

Under the "second Strickland prong," prejudice is only shown when there is a "*reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]" E.g., Woodford v. Visciotti, 537 U.S. 19, 22 (2002) (per curiam) (quoting

<u>Strickland</u>, 466 U.S. at 694 and adding emphasis). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 23 (quoting <u>Strickland</u>, 466 U.S. at 694).

When a state court has addressed a petitioner's ineffective-assistance claims on the merits and applied the <u>Strickland</u> test, a federal court must accord the state court's determination the deference required by 28 U.S.C. § 2254(d). <u>Rompilla</u>, 545 U.S. at 380. Assuming there are no issues with respect to the state court's findings of fact, the federal court's review is limited to the determination of whether the habeas petitioner has met the burden of proving that "the state court applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner." <u>Woodford</u>, 537 U.S. at 25; <u>see also</u> <u>Rompilla</u>, 545 U.S. at 380. The Supreme Court has characterized the application of the <u>Strickland</u> standard through the prism of AEDPA as amounting to a "doubly deferential" standard of review. <u>E.g.</u>, <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009).

### 2. Claim not presented to the state courts

One of the ineffective of assistance of trial counsel ("IATC") claims that Howard makes in his habeas petition is that his trial attorney never asked for the sword and the brown blanket in which it was wrapped to be tested for DNA or fingerprints to prove his innocence. (Docket No. 2). Howard asserts that he "asked him to do this and he did not." <u>Id</u>. The State argues, however, that Howard never presented this claim during the state court proceedings and that, as a consequence, the court must reject it because of a lack of state court exhaustion, and, more importantly, procedural default based on the state law prohibition against misuse of process discussed earlier.

A careful review of the record, including particularly Howard's appeal brief in <u>Howard II</u> (Doc. No. 42), reveals that the State's objection is well-taken. While Howard did raise an IATC claim with respect to the brown blanket, it was a different claim and not that it should have been

tested along with the sword for DNA and fingerprints. Consequently, Howard's IATC forensic-testing claim need not be considered as it has been procedurally defaulted.

### 3. Howard's remaining ineffective assistance claims

#### a. State court proceedings

Howard also claims that his trial counsel was ineffective in that he: (1) failed to offer into evidence a letter to him by Cave after they were arrested; (2) failed to investigate the brown blanket in terms of how it came into the State's possession and object to its admission into evidence; and (3) failed to object to jurors that he claims were biased. (Doc. No. 2 at 6-7). It appears that Howard raised these claims in his state postconviction proceeding and that the State responded to them. (Exs. 35, 38-39). What is less clear, however, is the state district court's treatment of the claims along with whether they were raised on appeal to the North Dakota Supreme Court and addressed there on the merits. Why this is so requires some discussion, which is also material to Howard's separate postconviction claim of prosecutorial misconduct that is addressed later.

After Howard filed his petition for postconviction relief, the State answered and moved for summary disposition pursuant to N.D.C.C. § 29-32.1-09(3), which provides as follows:

> The court may grant a motion by either party for summary disposition if the application, pleadings, any previous proceeding, discovery, or other matters of record show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

In response, Howard filed a second petition and the state again moved for summary disposition. Finally, and this time with the assistance of counsel, Howard filed a supplement to his petition, contending, among other things, that a hearing should be held on his petition. The State then moved for summary disposition for a third time. (Exs. 33-40).

The state district court rejected Howard's request for a hearing and disposed of his postconviction claims (both IATC and substantive) upon summary disposition. In its order

dismissing Howard's claims, the district court explicitly addressed the IATC claim of trial counsel failing to offer Cave's letter into evidence. The district court did not, however, explicitly address the IATC claims having to do with the alleged failure to investigate and object to the brown blanket and failure to object to allegedly biased jurors, except, when discussing a separate substantive claim relating to jury selection that has not been advanced in this proceeding, stating in passing that Howard's complaints about jury selection appeared to relate more to his ineffective assistance claim. (Ex. 40).

Howard then appealed the summary disposition of Howard's postconviction claims to the North Dakota Supreme Court. What is less than clear, however, is whether he appealed more than simply whether the district court had erred in disposing of his claims upon summary disposition without a hearing. (Exs. 41-42).

The North Dakota Supreme Court affirmed the district court's summary dismissal of Howard's claims, concluding that the district's court's use of the summary disposition procedure was appropriate because Howard had failed to respond to the State's motion for summary disposition by offering evidence sufficient to create issues of fact either by way of affidavit or by pointing to particular portions of the existing record that would support his claim, including specific page references to any pertinent trial testimony as required by N.D.C.C. § 29-32.1-04. Howard II, 2015 ND 102, ¶¶ 7-17. In so deciding, the North Dakota Supreme Court concluded, at least implicitly, that Howard's allegations in his petition (which were attested to under oath thereby raising their status to that of an affidavit) were insufficient to create a fact issue requiring a hearing.

After careful consideration of the state court record, the court concludes that Howard's postconviction claims, including the remaining IATC claims at issue in this section, were rejected on the merits thereby giving rise to AEDPA deference to the state courts' determinations. See Steen

v. Schmalenberger, 687 F.3d 1060, 1064 (8th Cir. 2012) (treating as a denial on the merits, thereby invoking AEDPA deference, a state court's denial of a claim of ineffective assistance of counsel for lack of evidence because of the failure to submit the trial transcript so the prejudice prong of Strickland could be evaluated); cf. Richter, 562 U.S. at 98-100 (presumption of adjudication on the merits unless it is clear there is some other explanation for the state court's decision).[4]  With this background, the court will turn to the individual IATC claims that are properly before the court in this section and then address the separate postconviction claim of prosecutorial misconduct later.

### b. The co-conspirator's letter

As noted above, one of Howard's IATC claims is that his trial attorney should have offered into evidence a letter written to Howard by Cave after they both were arrested and in custody. Specifically, Howard states in his habeas petition the following:

> The attorney prevented me from receiving a fair and impartial trial.  In December of 2011, defense counsel came into possession of a letter, written by Ms. Cave.  This letter is proof of Ms. Cave's web of lies.  Also contained exculpatory evidence as to my culpability in the crimes as charged.  This letter was never disclosed to the State prior to trial.  I asked him, Steve Mottinger, to enter it as evidence.  The jury requested the letter during deliberations.  The jury was denied the ability to review the letter and as a result of such denial, I was prejudiced by a verdict reached based upon an improperly presented defense.

(Doc. 2 at 6).

The state district court denied this claim, holding that Howard had failed to specify how the result would have been different, which appears to be a conclusion that Howard failed to satisfy the second Strickland prong.  (Ex. 40 at ¶ 4).   The district court also went on to state:

> The Petitioner has not established ineffective assistance of counsel.  To succeed with a claim of ineffective assistance of counsel, Petitioner must not only support his claim with proof, but also specify the probable different result.  This, the petitioner

---

[4]  However, if the court is wrong and the failure of Howard to either point to the relevant portions of the state court record with specificity or present other evidence should be treated as a procedural default, then Howard's remaining claims of ineffective assistance need not be considered for the reasons previously articulated.

has failed to establish to the court's satisfaction. His claim is premised on trial counsel's failure to admit into evidence a letter written to Mr. Howard by Janelle Cave and delivered to him in jail shortly after they both were arrested...Most of the letter is rambling, irrelevant, self serving, and perhaps even prejudicial to Petitioner. Trial counsel very effectively used the letter, which is likely inadmissible, to impeach Ms. Cave, by contrasting the pertinent part of the letter to her sworn testimony and recorded statements.

The relevant part of the letter states, "I need to get out so I can help you get out, also, because you don't belong in here either. I know you had nothing to do with that because you aren't like that at all. I know you aren't. And another thing would be f'ing impossible because I would know if you left the house after we got home, and you didn't because I heard you from my room (laugh out loud), plus I woke up with you next to me, but anyways, all I'm saying is I know you had nothing to do with it, boo." Trial counsel's questions concerning the letter are recorded on pages 106-107 of the August 20, 2012 trial testimony transcript. He asked at least 13 questions based on the letter in an effort to impeach Ms. Cave. Trial counsel got about as much benefit from the letter as possible. Petitioner fundamentally disagrees with defense counsel's trial strategy, yet the court finds defense counsel committed no error concerning the jailhouse letter.

(Ex. 40, ¶¶ 4-5). This appears to be a conclusion that the trial counsel's handling of the letter was not deficient and a rejection of this IATC claim for failure to satisfy the first <u>Strickland</u> prong.

The court here need only address the first <u>Strickland</u> prong. After Cave admitted to writing the letter, the following line of questing took place:

Q: And isn't it true you told Mr. Howard you know he had nothing to do with this?
A: In the letter, that's what I wrote, yes.
Q: You wrote that in the letter?
A: Yes.
Q: And that letter was written shortly after you were arrested?
A: Yes.
Q: And that statement is substantially different from the two statements you gave to law enforcement on the 8th of July?
A: Yes.
Q: It's substantially different from your testimony in your own trial?
A: Yes.
Q: And it's substantially different from your testimony today.
A: Yes.

(<u>Id</u>. at 106-107). Through this line of questioning, Howard's attorney not only used the letter as impeachment, but further was successful in eliciting as affirmative evidence that she had stated in

the letter that Howard had nothing to do with commission of the charged crimes. In other words, Howard's attorney got the substance of the letter before the jury without having to admit it and Howard has failed to demonstrate why this was ineffective assistance, particularly in light of the district court's determination that the remainder of the letter was rambling, confusing, and possibly even adverse to Howard. See Link v. Luebbers, 469 F.3d 1197, 1204 (8th Cir. 2006) (an attorney's "tactical decision[s] enjoy a strong presumption of reasonableness.").

In short, the state district court's rejection of the IATC claim having to do with the Cave letter was not an unreasonable application of Strickland.

### c. Failure to investigate and object to the blanket

Howard's claim of ineffective assistance with respect to the brown blanket is that he failed to investigate the origin and method by which the blanket was obtained by law enforcement and then later to object to its admission into evidence. It appears this claim was rejected by the state district court because of Howard's failure to articulate more precisely what trial counsel could and should have done and how it would have made any difference. Given what little evidence was presented by Howard with respect to this claim, this also was not an unreasonable application of Strickland.

### d. Failure to object to jurors

Howard further claims in his petition here that his trial attorney "did not fight or object to the jury selection even with bias." (Docket No. 2 at 7). In his state application for postconviction relief, Howard stated the following with respect to this claim:

> And during jury selection Counsel failed to object to jurors who indicated they would not be able to be fair and impartial was prejudicial. A juror indicated that she was friends at work with the victim's friends and family. This Juror worked at Cavendish with those who were close to the victim and said she had heard a lot about this case through them. Counsel failed to strike this Juror and that was prejudicial towards the Defendant.

(Ex. 35).

The Sixth Amendment guaranteed Howard the right to an impartial jury. See Irvin v. Dowd, 336 U.S. 717, 722 (1961); Johnson v. Armontrout, 961 F.2d 748, 755 (8th Cir. 1992) ("Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel.") (internal citations omitted). To prevail on an IATC claim for failure to strike a biased juror, a habeas petitioner must show that the juror was actually biased against the petitioner. Goeders v. Hundley, 59 F.3d 73, 75 (8th Cir. 1995) (citing Smith v. Phillips, 455 U.S. 209, 215 (1982)). "Whether a juror is biased 'is a question of fact, and [a federal habeas court] [will] defer to the state court's finding of juror bias "if it is fairly supported by the record." Mack v. Caspari, 92 F.3d 637, 642 (8th Cir. 1996) (quoting Antwine v. Delo, 54 F.3d 1357, 1369 (8th Cir. 1995)).

It appears the state district court similarly rejected this IATC claim because of insufficiency of evidence in that the only thing that Howard proffered in response to the State's motion for summary disposition was the somewhat vague and conclusory allegations of his petition. Howard did not, for example, present either juror affidavits or a transcript of the attorney's voir dire. Given the record that was before the state court, the rejection of the claim was also not an unreasonable application of Strickland.

## C.     Ground Three:  Multi-county jury panel and change of venue

### 1.     Introduction

On direct appeal in Howard I, Howard raised objections to both the district court's use of a multi-county jury pool and to its denial of Howard's motion for change of venue. In his habeas petition here, Howard alleges:

> In the case at hand, I was tried in Stutsman County, ND, the same county that Cave was tried on the same charges of murder and criminal conspiracy. The State filed a Memorandum on Jury Pool and requested that there an increase from 80 to 140 people to whom a questionnaire be sent and see if we can obtain a satisfactory

pool here in Stutsman County using only residence of Stutsman County. The Court issued its Order Directing Multi-County Jury Panel ordering that a panel of 80 perspective jurors shall be summoned for the trial, 60 from Stutsman County and 20 from Barnes County, an adjoining County in the same judicial district. I, the Defendant then filed Motion for Change of Venue followed by an Amended Motion for Change of Venue and the Court denied that Amended Motion. However, where prejudice to the defendant from pretrial publicity is obvious a change of venue should be ordered.

(Docket No. 2 at 8).

To the extent that Howard is making claims here with respect to both the use of the multi-county jury pool and to the denial of the motion for change of venue, the State argues that Howard did not present either of these claims to the state courts as a federal constitutional claim. (Ex. 28, ¶¶ 27-31). As a consequence, the State argues this court must reject the claims as having been procedurally defaulted.

### 2. Multi-county jury panel

A fair reading of Howard's petition is that he has not challenged here the use of the multi-county jury pool, most probably because the North Dakota Supreme Court determined he waived the issue because he failed to raise a timely objection at trial on this ground. Howard I, 2013 ND 184, ¶16. ("Because Howard did not object to the usage of § 27-09.1-05.1 at the district court, that issue is not properly before us."). But, even if Howard is attempting to raise the issue here, the North Dakota Supreme Court's dismissal of the claim on independent state law grounds bars consideration of it for the reasons previously articulated. Also, the court agrees with the State's argument that Howard failed to present to the state courts a claim of a federal constitutional violation with respect to the use of the multi-county jury pool and that any such claim now has been procedurally defaulted for that reason as well. The only argument that Howard presented to the North Dakota Supreme Court in his appellate brief on direct appeal was that the use of the multi-

county jury pool in this instance was not one of those authorized by the state statute allowing for the use of multi-county juries. (Ex. 28). He did not mount a federal constitutional challenge.

### 3. Change of venue

As for Howard's claim that the trial court should have granted his motion for change of venue, the court is not so sure that a claim of federal constitutional violation was neither presented to nor adjudicated by the North Dakota Supreme Court. While it is true that Howard did not explicitly reference a federal constitutional provision or cite to any federal case construing an applicable federal constitutional provision in his state appellate brief, he did contend that he was denied a "fair trial" because of the failure to change the venue. Further, while the cases he cited were all North Dakota Supreme Court cases and those cases in turn cited only to other North Dakota cases, it appears, when one drills down through the line of state-court precedent to even earlier cases, that the right primarily being addressed is the right to a fair trial under the federal constitution. See, e.g., State v. Olson, 274 N.W.2d 190, 193-94 (1978); Olson v. North Dakota District Court, 271 N.W.2d 574, 582-83 (1978). In other words, this appears to be a situation like the one described by Justice Alito in the majority opinion in Johnson v. Williams, __ U.S. __, 133 S.Ct. 1088 (2013), where "the line of state precedent is viewed as fully incorporating a related federal constitutional right" such that a "a state appellate court may regard its discussion of the state precedent as sufficient to cover a claim based on the related federal right." Id. at 1094-95.

Turning to the merits, the North Dakota Supreme Court in relevant part concluded:

> [¶ 17] Howard argues the court erred in denying his motion for a change of venue. Rule 21(a), N.D.R.Crim.P., provides "[u]pon the defendant's motion, the court must transfer the proceeding against the defendant to another county if the court is satisfied that so great a prejudice against the defendant exists in the transferring county that the defendant cannot obtain a fair and impartial trial there." "A defendant seeking a change of venue under N.D.R.Crim.P. 21(a) bears the burden of demonstrating a reasonable likelihood of prejudice so pervasive that a fair and impartial jury could not be found." State v. Erickstad, 2000 ND 202, ¶ 7, 620

N.W.2d 136. "A motion for change of venue is addressed to the sound discretion of the district court, and its decision will not be reversed on appeal absent a showing of an abuse of discretion." State v. Stridiron, 2010 ND 19, ¶ 11, 777 N.W.2d 892.

[¶ 18] Additionally, this Court has provided, in cases involving heavy media saturation, the "quantity of media coverage does not control a motion for change of venue; rather, the defendant must show there was prejudicial publicity which caused such bias that it would be impossible to select a fair and impartial jury." Id. Furthermore, this Court would "generally prefer" a district court to wait until voir dire is conducted to first determine whether it is possible to select a "fair and impartial jury." Id. However, this Court has also indicated "prejudice to a defendant may be so obvious that a change of venue may be ordered immediately." Id.

[¶ 19] Here, the court originally denied Howard's motion for a change of venue prior to voir dire. The court cited the rule a change of venue is generally inappropriate before voir dire. The court also stated, "a multi-county jury panel and the use of jury questionnaires should mitigate the effects of pretrial publicity." The court included in its order the motion for change of venue may be renewed "if examination of potential jurors during voir dire reveals that it is impossible to seat a fair and impartial jury." Following voir dire, Howard did not renew his motion.

[¶ 20] Although there was extensive media exposure in this case, the district court did not act in an arbitrary, unreasonable, or capricious way in concluding a fair and impartial jury could have been impaneled from the multi-county jury panel. Publicity per se is not necessarily prejudicial or damaging to a criminal defendant. State v. Ellis, 2001 ND 84, ¶ 6, 625 N.W.2d 544. Here, the district court instructed that the panel was to be composed of sixty prospective jurors from Stutsman County and twenty from neighboring Barnes County. Juror questionnaires were mailed and returned in advance of trial to screen out prospective jurors tainted by the media coverage. These screening techniques as well as voir dire itself served as an effective barometer for the court to evaluate potential juror taint.

[¶ 21] The case at bar is analogous to our decision in Stridiron in which we affirmed a district court's denial of a defendant's motion for change of venue based on prejudicial pretrial publicity. Stridiron, 2010 ND 19, ¶ 14, 777 N.W.2d 892. Stridiron similarly involved two co-defendants in a murder trial. Stridiron, who was on trial for felony murder, made a motion to disseminate a public opinion survey and for a change of venue based upon alleged prejudicial pretrial publicity. Id. The district court denied the motion and instead prepared its own "extensive questionnaire for potential jurors" to ascertain the level of community bias created by the media attention the case garnered. Id. at ¶ 12. Additionally, each of the empaneled jurors was questioned by the State and the defense during voir dire, and the district court found that it was possible for the defendant to have a fair and impartial jury. Id. Under those facts, we concluded the district court did not abuse its discretion in denying the motion for change of venue.

[¶ 22] Here, as in <u>Stridiron</u>, those same precautions were taken by the district court to screen for pretrial prejudice. We conclude that the precautions taken by the district court are appropriate in determining whether a criminal defendant can receive a fair and impartial jury. As a result of the actions taken by the district court in gauging the level of pretrial publicity and in working to secure an adequate jury pool, we hold the court did not abuse its discretion in denying the motion for change of venue.

<u>Howard I</u>, 2013 ND 184, ¶¶ 17-22.

The court concludes this was not an unreasonable application of prior United States Supreme Court precedent. In <u>Skilling v. United States</u>, 561 U.S. 358 (2010), the Supreme Court concluded that "pretrial publicity - even pervasive, adverse publicity - does not inevitably lead to an unfair trial" and that a presumption of prejudice is reserved for the rare case presenting exceptional circumstances. <u>Id.</u> at 378-85. Here, while there was substantial media exposure, there was no showing of exceptional circumstances that would invoke an irrebuttable presumption of jury bias of the kind discussed in <u>Skilling</u>. In fact, after jury selection was completed, the motion to change venue was not renewed, most probably because the additional measures employed by the district court were successful in addressing the prior media exposure.

**D.    Ground Four:  Prosecutorial misconduct**

**1.    Howard's claim of prosecutorial misconduct**

Howard also alleges prosecutorial misconduct. More specifically, he alleges that:

The prosecutor offered his opinion during closing argument, referred to evidence not admitted during the course of the trial. The prosecution made statements that was not entered into or admitted to evidence. The argument at closing argued that the defendant inflicted and that the decedent suffered head trauma while on the gravel road. That argument cannot be supported by the evidence and testimony offered at trial and was, therefore, misleading and unfairly prejudicial. Prosecution states "he must have gotten the last final blow to his brain after fighting of the sword attack." During direct from prosecution, page 94, line 6-8, to Dr. William Massello, asked, "are you able to give and opinion as to which of the wounds occurred first?" Answer "No". If you see through out Dr. William Massello he really don't know which would was first or last.

(Docket No. 2 at 9-10).  (Errors in original).

## 2. State court proceedings

Howard did not object to these statements during the prosecution's closing argument. However, he did argue that the statements amounted to prosecutorial misconduct in a motion for new trial (Ex. 21), which the trial court denied after concluding that the prosecutor's statements were within the bounds of fair argument because there was evidentiary support for them. (Exhibit 23 at 3-4).

Howard never raised this issue of prosecutorial misconduct in his direct appeal to the North Dakota Supreme Court.  Rather, he raised it later in his state postconviction proceeding (along with another claim of prosecutorial misconduct that is not a part of his present petition) and the State responded on the merits rather than claiming that Howard had procedurally defaulted on the claim for not including it in his direct appeal.  (Exs. 37 at ¶¶ 46-49; 39 at ¶¶ 46-49).  The State's response was that the prosecutor's argument was a fair one based on the evidence, which it outlined in some detail along with supporting citations to the record.  (Exs. 37 at ¶¶ 48-49; 39 at ¶¶ 48-49).

In its order of summary disposition of Howard's postconviction claims, the state district court stated the following with respect to the allegations of prosecutorial misconduct that had been alleged in that proceeding:

> The Petitioner rests his second claim on prosecutorial misconduct.  If the prosecutor's actions were misconduct, then an examination as to whether the misconduct had prejudicial effect must be undertaken.  To determine whether a prosecutor's misconduct rises to a level of a due process violation, it must be determined if the conduct, in the context of the entire trial, was sufficiently prejudicial to violate a defendant's due process rights.  Coppage v. State, 2014 ND 42, 843 N.W.2d 291, 299-300.  This second claim is not supported by any fact or admissible evidence.  There has been no reference or citation made to the record to support the claim, even though the trial transcript is readily available.

(Ex. 40, ¶ 6). Then, as noted earlier, the North Dakota Supreme Court affirmed the district court's summary disposition of Howard's postconviction claims based primarily upon the failure of Howard to have properly supported them. Howard II, supra.

### 3. Conclusion

Given the foregoing, the court will address the claim of prosecutorial misconduct on the merits. This review, however, is "exceptionally limited" as explained by the Eighth Circuit in James v. Bowersox, 187 F.3d 866 (1999), where the court stated:

> The absence of a timely objection is particularly significant to a claim of prosecutor misconduct in closing argument. Defense counsel heard the alleged misconduct and was in a far better position to judge its significance to the trial than an appellate court reading a cold transcript. The trial court also heard the alleged misconduct and likewise was in a better position to judge its significance. The trial court has the power to intervene *sua sponte*, for example, with a criticism of the prosecutor or a cautionary instruction. But that sort of interruption risks frustrating defense counsel's tactical decision not to object. See Darden v. Wainwright, 477 U.S. 168, 182-83 & n. 14, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The combination of these factors-the strict due process standard of constitutional review, the deferential review mandated by AEDPA, and our less reliable vantage point for gauging the impact of closing argument on the overall fairness of a trial-calls for an exceptionally limited review of this issue. Federal habeas relief should only be granted if the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial.

Id. at 869. Furthermore, "[r]elief will be granted only upon a showing of a reasonable probability that the outcome would have been different but for the improper statement[s]." Barnett, 541 F.3d 804, 813 (8th Cir. 2008; see also Kennedy v. Kemna, 666 F.3d 472, 481 (8th Cir. 2012).

The implicit conclusion of the state courts in denying postconviction relief appears to have been that Howard failed to demonstrate that the remarks of the prosecutor at issue were sufficiently prejudicial so as to deprive him of due process. Here, the court not only agrees with this assessment, but also concludes that the trial court got it right earlier when, in denying Howard's motion for new

trial, it concluded that the prosecutor's argument was not objectionable because it was within the scope of the evidence.

One permissible inference that could be drawn from the evidence is that the more serious head trauma suffered by Ahmed did not take place until he was placed out on the road, after his long journey in the back of the vehicle, and where, according to Cave, he was kicked and stabbed by Howard. This evidence includes: (1) the testimony of the pathologist who opined that Ahmed suffered several defensive wounds consistent with his fending off incoming blows from a sharp object; (2) the only evidence of a sharp object being used against Ahmed was him being attacked with a sword after he was removed from the vehicle with Howard and Cave both pointing to the other as to who used the sword; (3) the lack of any substantial amount of blood being found in the vehicle, which suggests that the defensive wounds were suffered after he was removed from the vehicle and not earlier; (4) the pathologist's testimony that Ahmed would have been conscious and thinking for him to react and attempt to fend off the attack with the sharp object; and (5) the pathologist's testimony that the traumatic brain injury that occurred likely would have rendered Ahmed unable to engage in the level of thought necessary to fend off the attack beyond a few short moments, which suggests that the blow causing the traumatic brain injury did not occur in the scuffle that occurred prior to Ahmed being placed in the vehicle, where he remained for a long period of time, but rather occurred after when he was taken out of the vehicle and attacked again.[5] (Exs. 48 at 194-95; 49 at 88-12; 50 at 52-57).

---

[5] Even if the prosecutor's comments crossed over the line of fair comment, the jury was instructed that the arguments made by the attorneys during the opening and closing arguments "must not be considered by you as evidence" and that "[i]f counsel or I have made any comments or statements concerning the evidence which you find are not supported by the evidence, you should disregard them and rely on your own recollection or observation." (Ex. 46 at 19).

## IV.  CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right.  When the court has rejected a petitioner's claim on the merits, the substantial showing required is that the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also, United States v. Lambros, 404 F.3d 1034, 1036-1037 (8th Circ. 2005); Garrett v. United States, 211 F.3d 1075, 1076-1077 (8th Cir. 2000).  When the court denies a petitioner's claim on procedural grounds without reaching the merits, the petitioner must demonstrate that reasonable jurists would find it debatable that a valid claim for the denial of constitutional rights has been stated and that the district court was correct in its procedural ruling. Slack, 529 U.S. at 484.

In this case, reasonable jurists would not find debatable the dispositions of the claims, whether on the merits or on procedural grounds.  Consequently, the court will not issue a certificate of appealability.

## V.  CONCLUSION

For the reasons discussed above, the court finds that Howard has failed to establish that he is entitled to relief based on state court proceedings that were contrary to, or an unreasonable application of, clearly established federal law, or based upon an unreasonable determination of the facts in light of the evidence presented in state court proceedings.  § 28 U.S.C. 2254(d).  Therefore, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  The State's motion to dismiss (Docket No. 8) is **GRANTED**.

2.  Howard's § 2254 petition (Docket No. 2) is **DENIED.**

3.      A certificate of appealability is not issued.

Dated this 22nd day of January, 2016.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court
